UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA       )
                               )
            v.                 )     Cr. No. 19-10477-MLW
                               )
RAFAEL ASHWORTH,               )
        Defendant.             )

MEMORANDUM AND ORDER

WOLF, D.J.                                          June 13, 2023

I.   SUMMARY

Defendant Rafael Ashworth is charged with: (1) one count of possession with intent to distribute 40 grams or more of fentanyl, 50 grams or more of methamphetamine, and heroin; and (2) one count of distribution and possession with intent to distribute fentanyl resulting in the death of Nicole Fusaro. Superseding Indictment (Dkt. No. 62).

Ashworth filed a motion to suppress all of the statements he made to law enforcement officers while they were at his apartment on November 17, 2019. 2nd Mot. to Suppress at 1 (Dkt. No. 105). He does not argue that suppression is warranted because officers failed to give him Miranda warnings before asking him questions. Rather, he contends that his statements were involuntary because he was under the influence of cannabinoids, and was later diagnosed with, among other things, renal failure. Mem. in Supp. at 3-8 (Dkt. No. 106).

.

The government opposes Ashworth's motion on two grounds. First, in response to the September 25, 2022 Memorandum and Order (Dkt. No. 99), but not any argument by Ashworth, the government asserts that officers were not required to give Ashworth Miranda warnings because Ashworth was never subject to custodial interrogation. Gov't Opp'n at 5-8 (Dkt. No. 109). Second, the government contends that suppression is not justified because the officers' conduct and questioning were not coercive and, therefore, his statements were not involuntary. Id. at 8-12.

For the reasons described below, the officers were not required to give Ashworth Miranda warnings and they did not coerce his statements. Accordingly, the motion to suppress  is being denied.

## II.  PROCEDURAL HISTORY

On December 18, 2019, Ashworth was charged with possession with intent to distribute 40 grams or more of fentanyl, 50 grams or more of methamphetamine, and heroin. Indictment (Dkt. No. 11). On February 10, 2021, the government filed a Superseding Indictment adding a charge of distribution and possession with intent to distribute fentanyl resulting in death. Superseding Indictment (Dkt. No. 62).

On November 12, 2021, Ashworth filed a motion to suppress all evidence obtained in the searches of his apartment at 7 Morse Street. 1st Mot. to Suppress (Dkt. No. 78) ("First Motion to

Suppress"); Mem. in Supp. (Dkt. No. 79). The government opposed the First Motion to Suppress. Gov't Opp'n (Dkt. No. 81). The court held a hearing on the First Motion to Suppress on August 17, 2022. See Aug. 17, 2022 Tr. (Dkt. No. 97). During the hearing, the court raised an issue the parties had not addressed.

> [Defendant's counsel] Mr. Reddington  . . . asked if Miranda rights were administered, because having seen a dead body and the pills, []there was probable cause to make an arrest. And then the question would be was [the defendant] in custody. Even if they didn't say, "You're under arrest," would he have been allowed to leave? And I asked that question and I have to think about the response. . . . [There is a question of whether] statements made after . . . [Officer Scott] Lacerra discovered the pill press and the, sadly, dead body ought to be admissible or whether there should have been Miranda warnings. -[Y]ou certainly haven't briefed that, and I don't know if I'm going to decide that now.

Id. at 101:13-102:4.

On September 25, 2022, the court issued a Memorandum and Order denying Ashworth's First Motion to Suppress. Mem. & Order (Dkt. No. 99). The court wrote that:

> Ashworth did not move to suppress statements he made and evidence derived from them on the basis of his Fifth Amendment right to receive Miranda warnings that would be required if he was in custody. See Miranda v. Arizona, 384 U.S. 436 (1966). This issue was mentioned at the August 17, 2022 hearing. If requested, the court will provide Ashworth an opportunity to file another motion to suppress based on the Miranda issue.

Id. at 9 n.1.

On October 5, 2022, Ashworth's counsel requested an extension of time to file a second motion to suppress, Mot. (Dkt. No. 101),

which the court granted on October 6, 2022, Order (Dkt. No. 102).
Ashworth's counsel requested another extension on October 20,
2022. Mot. (Dkt. No. 103). The court granted that request on
October 21, 2022, and set a deadline of November 4, 2022. Order
(Dkt. No. 104).

On November 2, 2022, Ashworth filed a motion to suppress "all
statements" he made during the officers' November 17, 2019 visits
to his apartment. 2nd Mot. to Suppress (Dkt. No. 105) ("Second
Motion to Suppress"); Mem. in Supp. (Dkt. No. 106).[1] On November
16, 2022, the government filed its opposition. Gov't Opp'n (Dkt.
No. 109). Ashworth did not file a reply.

III. FACTS RELATING TO THE SECOND MOTION TO SUPPRESS[2]

The court finds that the following facts have been proven by
a preponderance of the credible evidence.

In November 2019, Ashworth lived at 7 Morse Street, Apartment
1 ("the apartment"). See Aug. 17, 2022 Tr. at 27:10-13 (Dkt. No.

---

[1]   Ashworth's memorandum in support of his Second Motion to
Suppress indicated that exhibits A, B, C, D, E, and F were
attached. Mem. in Supp. at 2 (Dkt. No. 106). However, no exhibits
were attached to the submission. The Clerk contacted counsel for
Ashworth on May 26, 2023; June 2, 2023; June 5, 2023; and June 9,
2023, regarding the exhibits. Counsel has not provided copies. The
court believes that it has located the exhibits elsewhere on the
docket.

[2]   The September 25, 2022 Memorandum & Order (Dkt. No. 99)
includes a fuller factual discussion. The summary here focuses on
the circumstances surrounding Ashworth's statements, including his
mental state.

97). On November 17, 2019, Ashworth made statements to officers when they visited the apartment on two separate occasions and asked him questions. Id. at 31:5-6, 32:4-10, 53:5-7, 56:25-57:24, 72:13-73:2. Following the second visit, Ashworth was taken to a hospital for medical treatment. Id. at 74:6-8.

A. First Visit and Statements

At approximately 2:30 p.m., Natick Police Officer Ryan Hall went to the apartment to complete a well-being check for Nicole Fusaro. Id. at 24:23-25:11. Hall was the only law enforcement officer who went to the apartment. Firefighters were also dispatched and were outside the apartment when Hall arrived. Id. 25:13. The firefighters knocked on the door of the apartment and no one answered. Id. at 25:18-20.

Ashworth's neighbor, Dennis Mabee, entered Ashworth's apartment through an unlocked door. Id. at 27:19-24. Hall did not ask Mabee to do so. Id. at 27:25-28:6. Hall and the firefighters did not follow Mabee into the apartment. Id. at 28:12-13. Mabee returned. Id. at 28:14-16. He informed a firefighter that there was someone inside the apartment who appeared to be passed out. Id. at 28:14-29:5-8. The firefighters entered through the apartment's unlocked door and Hall followed them inside. See id. at 29:9-11. Hall described the size of the apartment as "small." Id. at 31:24-32:1. When Hall reached the second floor of the apartment, a firefighter was there speaking to Ashworth. Id. at

5

29:20-30:9. Ashworth was sitting on the ground outside a bedroom door. Id. at 31:13-14. Ashworth was wearing shorts or boxer shorts with a blanket or comforter around his shoulders. Id. at 30:24-25. Hall thought that Ashworth looked like he had just woken up. Aff. of Ryan Hall at ¶8 (Dkt. No. 92-1).

A firefighter asked Ashworth if he needed any assistance. Aug. 17, 2022 Tr. at 31:7-9. Ashworth indicated that he did not. Id. at 31:11. Hall told Ashworth that Natick Police had received a request to complete a wellness check for Fusaro. Id. at 31:5-6, 32:4-8. Ashworth said he had not seen her in weeks, and that he was alright and did not need assistance. Id. at 32:10; see also Aff. of Ryan Hall at ¶10 (Dkt. No. 92-1). Hall and the firefighters left. Aug. 17, 2022 Tr. at 33:2-6.

B. Second Visit and Statements

Later that day, at approximately 4:20 p.m., Natick Police Officers Scott Lacerra and James Keohane went to the apartment in response to a report that an overdose was occurring. Aff. of Scott Lacerra (Dkt. No. 92-2); Aug. 17, 2022 Tr. at 50:19-51:11, 52:20-21, 65:15-18. Lacerra and Keohane were the only law enforcement officials present. Two or three firefighters also responded to the reported overdose. Aug. 17, 2022 Tr. at 51:12-13, 68:2-4.

The officers and the firefighters knocked on the apartment door and no one answered. See id. at 52:4-5. They entered the apartment together through the unlocked door, with Lacerra leading

6

the way. Id. at 52:4-9. The group went to the second floor. Id. at 52:16-23. The top of the stairs "opened into a bathroom" where Lacerra could see Ashworth kneeling with his head against the sink. Id. at 53:1-3. Ashworth was wearing only his boxer shorts. Id. at 53:16-17. Lacerra greeted Ashworth. Id. at 67:24-68:1. Ashworth slowly turned his head towards Lacerra and looked at him with a blank stare. Id. at 68:5-7. Lacerra considered the slow head movement and blank stare to indicate that Ashworth was under the influence of drugs or alcohol. Id. at 68:9-15. Lacerra told Ashworth that they had received a report of a drug overdose and asked him if he was the only one in the apartment. Id. at 54:2-8, 53:5-6. Ashworth responded that he guessed so. Id. at 53:7, 68:21-25. Though Lacerra thought Ashworth's appearance was consistent with being under the influence of drugs and alcohol, he did not think that Ashworth was experiencing an overdose. Id. at 54:9-13.

Firefighters brought Ashworth from the bathroom to the kitchen table and attended to him. Id. at 54:23-55:2, 70:14-17. The firefighters and Keohane stayed with Ashworth. Id. at 54:21-23.

Lacerra started looking around the apartment, id. at 54:15-18, and entered a bedroom through its open door, id. at 55:21-23. The bedroom was dark, so he shined his flashlight inside. Id. at 55:25-56:4. He saw a person, later identified as Fusaro, lying on a bed; a bowl of white powdery substance; and a pill press. Id. at

56:9-23, 62:1-10. He called the firefighters, who came and confirmed that Fusaro was dead. Id. at 56:19-22.

The white powdery substance was consistent in appearance with fentanyl.[3] Id. at 75:24-76:5. Lacerra observed that the same powdery substance was also scattered around the apartment and on the kitchen table. Id. at 75:4-8.

Lacerra went to the kitchen where Ashworth was seated at the table with the firefighters. See id. at 57:2-4. Ashworth appeared to Lacerra to be impaired. Id. at 72:17-19. He was staring off into space, and could not state what day of the week it was. Id. at 72:20-24. Lacerra asked Ashworth what the powdery substance was. Id. at 72:13-14. Ashworth said he did not know. Id. at 72:15-16. Lacerra then asked Ashworth who the person on the bed was. Id. at 56:25-57:1, 57:5-6. Ashworth said she was a 16-year-old girl. Id. at 57:8, 72:25-73:2. Lacerra was then given a license that belonged to Fusaro. Id. at 57:9-11. He asked Ashworth how long the girl had been there. Id. at 57:12-14. Ashworth said she had died sometime during the previous night. Id. at 57:15. Ashworth said he had been out all day and had just returned home. Id. at 57:23-24.

Lacerra stopped asking Ashworth questions. He notified his supervisor that there had been a death at the apartment. See id. at 58:1-2. Lacerra was told to escort Ashworth out of the

---

[3]   Lacerra testified that from his training he understood that merely touching fentanyl could cause an overdose. Id. at 84:4-13.

apartment. Id. at 58:10-11. Ashworth was not under arrest. Id. at 73:10-11. Before Ashworth was escorted out of the apartment, officers gave him clothes to wear. Id. at 58:14-19. Ashworth attempted to put his pants on over his arms. Med. Rs. at 5 (Dkt. No. 84-2 - sealed). Lacerra and Keohane walked Ashworth down the stairs. Aug. 17, 2022 Tr. at 63:22-24. The firefighters might have assisted the officers. Aff. of Scott Lacerra at ¶11. Ashworth was impaired, almost fell down the stairs, and Lacerra had to physically guide him. Aug. 17, 2022 Tr. at 73:21-24.

   C. Hospitalization

   Firefighters took Ashworth to MetroWest Hospital. Id. at 74:6-8. Medical records provide information on Ashworth beginning around 5:12 p.m., less than an hour after the officers and firefighters visited the apartment for the second time. The records indicate that Ashworth was brought to the hospital "by EMS with police present." Med. Rs. at 5 (Dkt. No. 84-2 - sealed). The records state:

> The patient was noted to be acting bizarrely and confused [at his place of residence]. . . . On arrival to the ED the patient is awake and cooperative. He is answering questions but somewhat confused and disoriented. He admits to some alcohol use. He denies other drug use. He is quite vague about the events of the day and cannot really tell me anything that occurred prior to his arrival here other than he knows he was drinking alcohol. The patient denies headache, visual changes, nausea, vomiting, chest pain, shortness of breath, abdominal pain or other symptoms. . . . The patient has oriented to person but thinks that it is Thursday, 2012.

_Id._ Ashworth's heart rate and breathing were normal, as were his motor and sensory functions. _Id._ at 5-6. His mental status was "altered," which doctors considered "[c]onsistent with likely substance use of some kind." _Id._ at 6. He was oriented to "person and place but not day or date." _Id._ Around 5:54 p.m., a doctor reviewed Ashworth's laboratory results. _Id._ at 6. The results indicated "some degree of dehydration and mild rhabdomyolysis contributing to his kidney function." _Id._ At about 6:58 p.m., a doctor noted that Ashworth remained "overall stable" and was "resting quietly. Plan to continue hydration, recheck labs to rule out acute rental failure. . . . Awaiting drug screen and urinalysis." _Id._ at 7. At about 10:30 p.m., a doctor wrote that Ashworth's mental faculties had "cleared slightly, but he still thought this was January 2019 with Obama as the president." _Id._ Chest x-rays showed "likely aspiration pneumonia." _Id._ Ashworth's urinalysis "was unremarkable" but his "[u]rine drug screen was positive for cannabinoids." _Id._ He was admitted with a diagnosis of: "Pneumonia, Mental status changes, Dehydration, Acute renal failure, Rhabdomyolysis, Hepatitis." _Id._ at 8. On November 18, 2019, a doctor opined that Ashworth "overdosed and developed an aspiration pneumonitis." _Id._ at 80. Ashworth was treated with intravenous "fluids and antibiotics" and discharged from MetroWest Hospital on November 19, 2019. _See id._ at 64.

That same day, the Lemuel Shattuck Hospital admitted Ashworth. Med. Rs. at 2 (Dkt. No. 84-3 – sealed). Ashworth advised that he drank a "full bottle of vodka with 3-4 pills of Xanax and snorted cocaine on the night of [November 16]." Id. at 3. Ashworth continued to receive intravenous antibiotics at the Lemuel Shattuck Hospital and was discharged on December 2, 2019. Id. at 9. Doctors at Lemuel Shattuck described Ashworth's aspiration pneumonia as "secondary to a drug overdose." Id. at 37. They further noted that Ashworth might "have a component of cocaine-induced lung injury or 'crack lungs.'" Id. at 39.

D. Miranda

The officers did not give Ashworth Miranda warnings during either visit to the apartment on November 17, 2019. See Aug. 17, 2022 Tr. at 73:25-74:5. They did not arrest Ashworth or tell him that he was not free to leave. Conversely, they did not tell him that they would not arrest him or that he was free to leave.

When questioned by the court, Lacerra stated the following about whether Ashworth was free to leave or under arrest during the second visit:

> THE COURT: You said you never -- that you didn't put Mr. Ashworth under arrest. But if he said to you in all the circumstances that he wanted to leave, he didn't want to be with you anymore, would you have let him go?
>
> THE WITNESS: With his current physical state and the fact that he couldn't even hold himself up, no. We would have made him go to the hospital.

THE COURT: And hypothetically, if it weren't for that, having seen the drugs, would you have let him go?

THE WITNESS: I believe detectives probably would have wanted to question him more, but at that point I would have no -- without knowing what exactly the powder was, I don't think I would have had probable cause to place him in custody.

THE COURT: And having seen the body on the bed, would you have let him go?

THE WITNESS: Not without further questioning, no.

Id. at 80:22-81:12.

IV.   ANALYSIS

A. Ashworth was not subject to custodial interrogation when he made his statements, therefore, no Miranda warnings were required.

Consistent with the Fifth Amendment right to avoid self-incrimination, "prior to a custodial interrogation, law enforcement officials must inform the individual to be interrogated that: (1) he has the right to remain silent; (2) his statements may be used against him at trial; (3) he has a right to an attorney during questioning; and (4) if he cannot afford an attorney, one will be appointed to represent him." United States v. Gonzalez, 719 F. Supp. 2d 167, 170 (D. Mass. 2010) (citing Miranda v. Arizona, 384 U.S. 436, 479 (1966)). If law enforcement officers fail to provide the required Miranda warnings the defendant's statements may be suppressed. See id.

Here, there is no dispute that officers did not provide Ashworth with Miranda warnings before asking questions that

elicited his statements on November 17, 2019. The question is whether law enforcement had any obligation to provide Miranda warnings to Ashworth. The answer turns on whether Ashworth was subject to custodial interrogation, although he had not been arrested, when he made his statements.

When no formal arrest has been made, a two-step inquiry is required to determine if there was nevertheless a custodial interrogation: (1) the court must "ascertain the circumstances surrounding the interrogation;" and (2) the court must "examine whether, viewed objectively, the discerned circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011) (citations omitted). The interrogating officer's intent, unless communicated to the defendant, is irrelevant. Id.

The First Circuit requires consideration of four factors in determining whether the totality of the circumstances demonstrates that an individual was in custody absent an arrest: (1) "whether the suspect was questioned in familiar or at least neutral surroundings;" (2) "the number of law enforcement officers present;" (3) "the degree of physical restraint;" and (4) "the duration and character of the interrogation." Id. (quoting United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)).

All four factors weigh in favor of finding that Ashworth was not subject to "'restraint on [his] freedom of movement of the degree associated with a formal arrest.'" See id. at 435 (citations omitted). Therefore, the officers did not violate Ashworth's Miranda rights because they were not required to give him Miranda warnings.

1. Officers questioned Ashworth in familiar surroundings.

Here, the first factor, familiar or neutral surroundings, Hughes, 640 F.3d at 435, favors the government. A suspect's home is "generally" a "less intimidating atmosphere" and favors a finding that a defendant was not in custody. Id. at 435-36. If a home is small, however, the size may weigh in favor of a defendant. United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003). Nevertheless, the size of the home is not determinative if there is nothing to suggested that "officers either exploited its cozy confines or invaded the defendant's personal space." Hughes, 640 F.3d at 436. In this case, the officers questioned Ashworth in his own home on both occasions. See Aug. 17, 2022 Tr. at 27:10-13, 52:24-53:7, 60:7-23. Although Ashworth's apartment was "small," Aug. 17, 2022 Tr. at 31:24-32:1, there no indication that officers exploited its size. The location of the questioning was familiar to Ashworth and weighs in favor of finding that Ashworth was not subjected to a custodial interrogation.

14

2. Only one or two officer were present.

The second factor, the number of law enforcement officers present, Hughes, 640 F.3d at 435, also favors the government. The First Circuit has found the presence of one or two law enforcement officers does not suggest that the defendant was restrained. Id. at 436 (finding that two officers was "not overwhelming" and collecting cases); United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991) (finding that "only two agents were present and only one did the questioning" suggested the defendant was not restrained); but see Nishnianidze, 342 F.3d at 14 (noting that, among other things, "three agents in a small area" supported suppression). In this case, there was one officer – Hall – present for the first visit. Aug. 17, 2022 Tr. at 24:23-25:11. There were two officers - Lacerra and Keohane - at the second visit when Ashworth made additional statements. Id. at 51:10-13, 52:20-21. Only Lacerra asked Ashworth questions. Id. at 53:5-57:24, 68:21-25, 72:25-73:2. The other individuals present were firefighters rendering aid to Ashworth. See Aug. 17, 2022 Tr. at 25:13-17, 51:12-13. Therefore, the number of officers supports a finding that Ashworth was not in custody.

3. Ashworth was under little, if any, physical restraint before or during questioning.

The third factor, the degree of physical restraint, Hughes, 640 F.3d at 435, also favors the government. When officers do not

state that a suspect is "free to leave or terminate questioning" that suggests "restraint." Lanni, 951 F.2d at 442. Conversely, when they do not make a "statement suggesting that defendant [is] not free to leave or terminate the questioning" that suggests that the defendant retains freedom of movement. Id. When officers neither make physical contact with the suspect nor brandish or use their weapons in a "show of force," these facts indicate that the "interrogation [is] non-custodial." Hughes, 640 F.3d at 436. Officers directing a suspect's movements, separating him from others, and monitoring his activity signals restraint. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007) (finding custodial interrogation when officers exerted physical control over defendant who was "ordered to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom").

Post-questioning restraint, if not communicated in advance to the defendant, does not indicate that a defendant was restrained while questioned. Hughes, 640 F.3d at 436-37. In Hughes, officers took the defendant into protective custody "upon the conclusion of the interview" because they were concerned that he would be a danger to himself or others. See id. The First Circuit found that this post-interview restraint, which officers had intended from

16

the outset without telling the defendant, "could not . . . have had any influence on the defendant's willingness to speak." Id.

Here, there is no evidence that the officers told Ashworth he was or was not free to leave - a factual wash supporting finding both freedom and restraint. Supporting the view that Ashworth was not restrained is the lack of evidence that any officer brandished or unholstered his weapon during either visit to Ashworth's home. There is also no evidence that Hall touched Ashworth during the first visit or otherwise directed his movements.

With regard to the second visit, there is no evidence that either officer touched Ashworth before or while Lacerra questioned him. Ashworth was brought from the bathroom to the kitchen table by firefighters who were administering aid. Aug. 17, 2022 Tr. at 54:23-55:2, 70:14-17. When the questioning was over, the officers let Ashworth dress. Id. at 58:14-19. They escorted him downstairs to receive medical treatment, which involved at least Lacerra touching him, as Ashworth struggled to walk on his own. See id. at 73:21-24. This indicates control over Ashworth. However, there is no evidence that before or while Lacerra questioned Ashworth he or Keohane told Ashworth that they would escort him to receive medical treatment. Their post-interview contact with and control over Ashworth is similar to the restraint in Hughes and does not affect the degree of restraint Ashworth was under during his interview.

In view of the foregoing, the third factor also weighs in favor of finding that Ashworth was not subject to custodial interrogation.

           4. The officers' questioning of Ashworth was short and non-coercive.

The fourth factor, the duration and character of the questioning also favors finding that the interrogation was not custodial. A short interview supports a finding that a suspect was not in custody. Hughes, 640 F.3d at 437 (considering an interview that was ninety minutes non-custodial); Nishnianidze, 342 F.3d at 14 (affirming denial of suppression when an interview was forty-five minutes or less); but see Mittel-Carey, 493 F.3d at 40 (determining that an interview that was ninety minutes to two hours supported a suspect being in custody). Officers using a polite tone weighs in favor of finding that a person was not in custody. Hughes, 640 F.3d at 437. Officers not using coercive tactics, such as "false information" or a "'good guy-bad guy' routine," does too. Lanni, 951 F.2d at 442. The time of day a suspect is questioned is also relevant. For example, a very early morning interview may indicate that a suspect was restrained. Nishnianidze, 342 F.3d at 14. Finally, the fact that a suspect is "appropriately dressed," rather than in underwear or pajamas, suggests that an interrogation was not custodial. Hughes, 640 F.3d at 437.

In this case, the officers' questioning of Ashworth was brief - well below 45 minutes - during both of their visits on November

17, 2019. See Aug. 17, 2022 Tr. at 31:5-6, 32:4-10, 53:5-7, 56:25-57:24, 72:13-73:2. There is no evidence that any officer used an aggressive or impolite tone, or any tricks or tactics when questioning Ashworth. Ashworth was questioned at reasonable times of the day: first, at about 2:30 p.m., Aug. 17, 2022 Tr. at 24:23-25:11; second, at about 4:20 p.m., id. at 65:15-18. Ashworth was not fully clothed on either occasion. During the first visit he was wearing shorts or boxers and held a blanket. Id. at 30:24-25. During the second visit he wore only underwear. Id. at 53:16-17. However, the officers did not prevent him from dressing properly. Rather, they ensured that he was dressed before he left the apartment. Id. at 58:14-19. As the duration and character of the interrogations and the other factors previously discussed indicate that Ashworth was not then in custody, Ashworth's lack of proper clothing is not sufficient to justify a finding that he was subject to custodial interrogation.

Rather, because the officers questioned Ashworth in his home, there were few officers present, Ashworth was subject to minimal physical restraint, and the officers' questioning was short and non-coercive in nature, Ashworth was not subject to custodial interrogation. Therefore, the officers were not required to give Ashworth Miranda warnings and suppression of his statements is not warranted on Miranda grounds. See Hughes, 640 F.3d at 435.

B. <u>Ashworth's statements were not involuntary for constitutional purposes, though he made them when in an altered mental state, because the officers' conduct was not coercive.</u>

The admission of "[a]n involuntary statement violates due process." <u>United States v. Jackson</u>, 918 F.2d 236, 241 (1st Cir. 1990). "The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" <u>Id.</u> (citation omitted). Examination of the totality of the circumstances requires "the juridical equivalent of an archeological dig" into: (1) the "nature of the police activity;" and (2) "the defendant's situation." <u>Hughes</u>, 640 F.3d at 438. When assessing whether police activity coerced the defendant, a court may consider "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities)." <u>Id.</u> The defendant's relevant "attributes" may include "his age, education, intelligence, and mental state." <u>Id.</u> Use of alcohol or drugs is a factor in a assessing a defendant's mental state. <u>See</u> <u>United States v. Holmes</u>, 632 F.2d 167, 169 (1st Cir. 1980) (finding a defendant's claim "that his will was overborne by alcohol or drugs" properly triggered an inquiry into whether defendant's statements were voluntary).

However, "coercive police activity is a necessary predicate to the finding that" a defendant's statements were involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986). This requirement of "coercive police activity, even if only in the form of a custodial interrogation," applies regardless of whether a defendant is in a "drug-addled" state. United States v. Diaz-Rosado, 857 F.3d 116, 123 (1st Cir. 2017). For example, in United States v. Palmer, 203 F.3d 55 (1st Cir. 2000), the First Circuit held that a defendant's mental state, altered because he was going through heroin withdrawal, was not dispositive because "mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness." Id. at 61-62; see also United States v. Chapman, 112 F. App'x 469, 474 (6th Cir. 2004) (affirming denial of suppression though the defendant made his statements in a "heroin-befuddled state" because there was no coercive police activity). Nevertheless, when interrogating officers are aware of a defendant's "compromised mental state . . . a lesser quantum of coercion is required" for a court to find the statements involuntary. Hughes, 640 F.3d at 438-39.

With regard to Ashworth, there is no evidence that his age, education, or intelligence make it likely that his statements were involuntary. As the government notes, Ashworth "was a 25-year-old male who maintained his own residence and appeared to be capable

21

of living independently and making his own decisions." Gov't Opp'n
at 12. The issue, however, is Ashworth's mental state at the time
officers questioned him. Ashworth argues, Mem. in Supp. at 3, 6-
7, and his medical records support, that he was in a compromised
state when officers questioned him on November 17, 2019. Ashworth
said he consumed a "full bottle of vodka," Xanax, and cocaine the
evening of November 16, 2019. Med. Rs. at 3 (Dkt. No. 84-3 -
sealed). Medical records from that day indicate that he was under
the influence of cannabinoids and was suffering from "Pneumonia,
Mental status changes, Dehydration, Acute renal failure,
Rhabdomyolysis, [and] Hepatitis." Med. Rs. At 8 (Dkt. No. 84-2 -
sealed). On November 18, 2019 and later, doctors opined that a
cocaine overdose caused his pneumonia. See id. at 80; Med. Rs. at
37 (Dkt. No. 84-3). This evidently affected Ashworth's mental
state. About an hour after officers and firefighters made their
second visit to Ashworth's apartment, doctors noted that Ashworth
was "somewhat confused and disoriented" and was oriented to "person
and place but not day or date." Med. Rs. at 5-6 (Dkt. No. 84-2 -
sealed). This is consistent with Lacerra's testimony that although
he did not think Ashworth was overdosing, Ashworth appeared to be
under the influence of drugs or alcohol, Aug. 17, 2022 Tr. at 54:9-
13, and was not able to recall what day of the week it was, id. at
72:17-24.

However, it is not proven that Ashworth was in an altered mental state during the first visit to his apartment when Hall spoke with him. More specifically, Hall only reported that Ashworth looked like he had just woken up. Aff. of Ryan Hall at ¶8 (Dkt. No. 92-1). Ashworth told firefighters and Hall that he did not need any assistance. Id. at ¶10; Aug. 17, 2022 Tr. at 31:7-11.

Ashworth argues that given his altered state the level of coercion the officers exerted was sufficient to make his statements involuntary. Mem. in Supp. at 6-8. Much of the excavation for the "archeological dig" into the officers' activity that the First Circuit requires, Hughes, 640 F.3d at 438, was addressed in the prior analysis of whether Ashworth was subject to a custodial interrogation. See supra Part IV.A. The fact that Ashworth was not subject to custodial interrogation weighs in favor of finding that the officers' conduct was not coercive. See Diaz-Rosado, 857 F.3d at 123 (requiring at least "custodial interrogation" to establish coercion when defendant was under the influence of drugs).

Moreover, the factors specific to the voluntariness inquiry indicate that Ashworth's statements were not the product of police coercion. First, the length and nature of the officers' inquiries, Hughes, 640 F.3d at 438, do not weigh in favor of finding coercion. As discussed earlier, Hall and Lacerra questioned Ashworth briefly. See Aug. 17, 2022 Tr. at 31:5-6, 32:4-10, 53:5-7, 56:25-57:24, 72:13-73:2. Ashworth notes that officers initiated the

encounters and argues that during the second visit they were aware of his compromised mental state but "rather than trying to help him" they "immediately" asked "incriminating questions such as if he knew who the woman was." Mem. in Supp. at 6-8. However, this is not an accurate characterization of the officers' conduct. The officers came to Ashworth's apartment to conduct a well-being check and to respond to a reported overdose. Aug. 17, 2022 Tr. at 24:23-25:11, 50:19-51:11. There is no evidence that they raised their voices, acted aggressively, used tricks, or asked questions that were leading or overly suggestive. Lacerra's brief questions were straightforward and directly relevant to assessing the situation in the apartment and the safety of everyone there. See Gov't Opp'n at 11-12. Rather than refusing to help Ashworth, firefighters administered aid to him. Aug. 17, 2022 Tr. at 54:23-55:2. Second, there is no evidence or allegation that any officer made "promises or threats" to Ashworth. See Hughes, 640 F.3d at 438. Third, there is no allegation, let alone evidence, that officers "deprived" Ashworth of "essentials." See id.

Even though Ashworth's altered mental state requires a "lesser quantum of coercion" to warrant suppression, id. at 438-39, the officers' conduct did not constitute the coercion needed to establish a constitutional violation rendering his statements involuntary, see id. at 439-40.

In view of the foregoing, Ashworth's motion to suppress the statements he made on November 17, 2019 is being denied.

V.   ORDER

It is hereby ORDERED that:

1.   Defendant Rafael Ashworth's Second Motion to Suppress (Dkt. No. 105) is DENIED.

2.   Counsel shall confer and, by July 12, 2023, report whether Ashworth requests a Rule 11 hearing or a pretrial conference.

3.   A Rule 11 hearing or pretrial conference shall be held on August 3, 2023, at 11:30 a.m.

4.   All time until the Rule 11 hearing or pretrial conference is EXCLUDED for Speedy Trial Act purposes because the interests of justice served by providing the defendant the opportunity to confer with his counsel and the government concerning how he wishes to proceed outweigh the interests of the public and the defendant in a speedy trial. See 18 U.S.C. §3161(h)(7)(A).

UNITED STATES DISTRICT JUDGE